Our next case is 2021-20396 SCD BLK 251 v. Mt. Jefferson Holdings, LLC. Ms. Goldblatt, you may proceed. May it please the court. Shana Goldblatt, proler for SCD, which I'll call Skanska because it's easier, the appellant in this real estate contract case. Today I'll focus on two issues, one substantive and one procedural. When an option contract does not say how to exercise, Texas law allows exercise through timely notice and tender within a reasonable time. With timely notice, the reasonable time for tendering can extend beyond the option period's end. Turning to the first issue, the substance, what does tender mean? Tender means bilateral engagement on the construction agreement. Bilateral engagement tracks span agreement's plain terms, aligns with contract principles, and makes commercial sense, particularly in the real estate industry. Mt. Jefferson sees tender differently. It equates tender with building, and it endorses two without any bilateral engagement. Doing so sidesteps the span agreement's bargain, it does not heed Texas contract principles, and it makes no commercial sense. With tender as bilateral engagement, we seek rendition. But if the legal question of tender means build, a fact question remains, so we move to the second issue on procedure. This procedural posture, whether the court views it as the pleading stage or summary judgment, does not leave room to resolve fact questions. What counts as a reasonable time to tender presents a fact question. Mt. Jefferson agrees at 62. Skanska suffered prejudice when the fact finder did not get to answer that question, and when Skanska did not get to collect and present evidence on it. In any event, this record cannot answer the reasonable time question, and so as an alternative to rendition, we seek a remand for fact finding. So I'll begin with what I think is Mt. Jefferson's key point, the focus of their briefing, that the span agreement is unenforceable. We disagree. We see it as enforceable because it has sufficiently definite terms, and I think that the Fisher case from the Texas Supreme Court, which both parties cited in our briefs sufficiently describes how to do the analysis as well as this brief. There's an intent to be bound. There's a binding effect paragraph in the span agreement and a memorandum paragraph. The parties predecessors agreed that it would be binding. There's also a basis for enforcement. Although we're not seeking enforcement in this case, the span agreement cabins the construction agreement terms, including the exact location design method timing and insurance, by reference to existing agreements for the existing sky bridges. Those provide a reasonable standard by which a court could enforce whether or not these agreements, whether the bilateral engagement fits within that. Moving on to reasonable time, it really is undisputed that that's a fact question, so at a minimum, it provides a basis for remand. Did you file for reconsideration? I can't remember. No, Your Honor. Why was that? We don't know. We don't know, Your Honor. Okay, because it was— We can't express. Of course, if you know or not, that's probably not to be— I don't know, Your Honor. Okay, because it would seem that if the conscientious trial judge overstepped and treated it as summary judgment and wasn't really ready to be summary judgment, that you could say, oh, there's a fact issue on these 13 things or whatever there are, how many you said there were, and at least on some of them, and it would have been handled that way. Yes, Your Honor. Can you point clearly to what your best fact issues are that were resolved against your client? Sure. Yes, Your Honor. The reasonable time question, that is a fact question under Texas law. Mount Jefferson doesn't dispute it. It's really unclear what the district court thought a reasonable time was, but if you read the decision, it seems like there's no way that we could have done it in, you know, whatever it thought tender meant, which I think there's kind of two alternatives in there. We couldn't have done it within a reasonable time, but if that's the decision, then reasonable time must have been decided that that is a fact issue. And then also, even if we get to the ready, willing, and able element or those questions, those were decided against us, and that is harmful. Was that presented in the motion to dismiss? The ready— Literally, yes. Pardon me, Your Honor. The ready, willing, and able standard, it was presented, but not as a specific performance case. The Bavarian-Baker that comes from Perry v. Little, those are not specific performance cases, but essentially the principle is if the other side isn't going to do anything, you don't have to just perform to show that you're, you know, able to do it. You can substitute that. The court will allow you to substitute that with ready, willing, and able. So perhaps there's some confusion there. The case law is a bit imprecise about, you know, that inquiry. But yes, Your Honor, that ready, willing, and able was mentioned in the brief, but not from a specific performance case. Okay. What is your best case that this is—that there's enough meat on the bones that this is not just an agreement to agree? Your Honor, I think the best case is the Fisher case. You know, there—all of these cases that the parties have cited in the briefs say that there—it's a case-by-case analysis, so we don't have an exact match here. But we think the Fisher case says enough. It asks for, like, the basic ingredients and the key question in that case, and then subsequent—or later Texas Supreme Court cases and cases from this court get to, can the agreement be enforced if necessary? Is there enough there that the agreement could be enforced? And here, for example, the—if we were seeking a contract action and seeking contract damages, which we currently are not, there could be—it could be enforced if—by the—if Mount Jefferson didn't unreasonably withhold—or did unreasonably withhold consent. We could seek a contract case on that. So what do you—what do you want us to do specifically? So specifically, we would prefer a render if you agree with us on what tender means. A render that said what? A render that says that we were entitled to the declaratory relief that we sought. Now, remind me again what that was. The specific declaratory relief that you were seeking, and you say if we send it back, then your favor you'll get, what is it? Yes, Your Honor, that we exercised our right and option under the Span Agreement. So then what? So then—then the case leaves the Court, and the parties move along. Either they continue negotiating, or—I mean, they're not currently—we're not currently negotiating—or something else, you know, might need to take place, but— You're not asking for any damages or anything. You're asking just for the render on the declaratory relief that this thing did, in fact, occur. Yes, Your Honor. Okay, what is the other thing you're asking for, an alternative? The alternative is a reverse and remand for—so that we can get facts on what counts as a reasonable time to tender performance. What is the point of us rendering on that if it's not pursuant to something else? What's— Well, Your Honor, this Court has said that the Declaratory Judgment Act and declaratory relief generally is a way for parties to solve disputes efficiently. The parties here don't agree on whether we tendered performance or, you know, we exercised our right, and that has halted real-world consequences. It has halted the construction of a skybridge that we have a right—we believe that we have a right to bilaterally engage on that issue. Is the building going up on that lot? Your Honor, currently, the building, the 1550 on the green, if Your Honors are familiar with the building where the skybridge would come from is not yet built, but part of that, and as reflected in the record in the hearing, we said that part of that is because we don't know where the skybridge will go, and we need to know that to be able to build the building. So, no, it's not yet built. But other construction on this big project, 1550 on the green, is well underway. So, taking the Judge Eskoski's opinion, not looking at what relief you want, whatever, but just let's look at his opinion. He says your performance needs to be done within a reasonable period of time. Let's say that is correct, not just the exercise of whatever rights you have, or declaring whatever rights that you have. How much has to be done, would you say, not as a matter of fact, but as a matter of law? What would performance look like? Well, I think it depends on what we think tender means. So, if we think tender means what we think it means. I'm accepting what Judge Eskoski said. Okay, yes. So, starting from there. Yes. And he's saying you must actually construct something within a reasonable period of time after December 31st, or whatever it was, 2020. So, what would that be in your interpretation of this? How much has to be done within a reasonable period of time? I mean, this phrase has been tossed around, bridge to nowhere. Right. Can you build the bridge? Can we? Add the building later? Is that your interpretation of this? If we needed to build a bridge, then yes, we could build a bridge. Well, I'm asking you to tell me, is that going to be enough? And if so, what are you relying on? How would we interpret that? I mean, I think there's some basic validity to what Judge Eskridge has said. I need to hear you tell me more than you have, or what's wrong with what he said. And so, one of the things that might be in question is he said you couldn't. It's no fact question. There's no way that you could do enough to perform under his understanding of what is required within a reasonable period of time. So, I'm asking you, not so much as a matter of fact, but a measure of law, what should he have been looking at as a legally sufficient performance? Perhaps just interpreting from the contract for the plain terms, say that, you know, if we needed to construct a skybridge, then construct the skybridge. But that requires engagement. So, requires what? Requires engagement from Mount Jefferson. They would need to engage with us by electing or, you know, declining, if we've proposed alternatives, alternative, you know, connection points. Assuming one of the questions in this case is if he's right all the way up to this point. Yes. That there is no, that performance must be completed within a reasonable period of time. If he's right to that point, then I think a question is just how much has to be done. And that's all I'm trying to get from you because I've not even heard any argument, though it was certainly in your brief, about what is wrong with those analyses. But you have been focused on other things by our questions, and that's fine. So, anyway, I think I have your answer. Well, if I might just follow up. What has to be done if you take, if you go from his premise, then I do think we would have to build the bridge. Would you have to have a building attached to it? Yeah. Where's the building? Yes, I mean, it could be either alternative. And I think the real key problem here is that even if you take both of those things, either one of them, we just didn't have a chance to show that we could do it within a reasonable time. Well, I think there's a premise for what he, maybe he actually says in his opinion what had to be done. Does he identify how much had to be done? I believe he looks at the part of the contract that says it's about use, and he says, like, if you're going to use it. Use? Use. It's used for the Skybridge once it's built. That, and I see my time's expired. I think you can. Thank you. That if it's going to be built, it has to be, he took it to mean it has to be connected to a Class A building. But that's not how, obviously, that's not how we interpret it. But I think that's where he gets it. All right. Thank you. Thank you. Good morning. My name is John Hardin. I represent Mount Jefferson, owner of the Four Seas and Hotels. Your Honors, this case is a pretty straightforward contract case under Texas law. In order for Judge Eskridge to determine whether, quote, the right was exercised on or before December 31st, 2020, he had to look at the plain language of the agreement and determine what was the right, which is exactly what he did. That right was expressed in Section 1, which defines the connection right. It grants the Block 251 owner, appellant, the future right to connect an air bridge or tunnel connection to a point on the wall of the improvements. So the plain language of the connection right is discussing physical attachment, which is consistent with the memorandum of span agreement that the parties in 2000 drafted, attached as a form to the span agreement, and then filed as an executed copy, again, contemporaneously in 2000. Specifically, that memorandum characterizes the span agreement as one concerning Block 251 owner's right to attach a connection. As such, Judge Eskridge's interpretation that the right at issue was the actual connection of an air bridge is entirely correct. It's entirely supported by a plain reading of the span agreement. Section 2 of the agreement states that this right to connect must be exercised, if at all, by December 31, 2020. And Section 7 further provides that time is of the essence. Here, no one disputes that there was no connection. And I think a key item that isn't discussed, but which goes to the core of Judge Eskridge's order and opinion, is that there was no building. There was no way there was going to be a connection. There was no building. And that was that. You would say immaterial, but isn't it disputed as to how far along the other side was in developing plans for that building? Your Honor, not at this stage. I mean, what was... I thought they had offered, in some form, an explanation that plans were being developed. We heard today another reason why it's not been finalized, because the span issue has to be regarded. But nonetheless, there does seem to be at least some argument in this case that they were underway, but it's not at all clear factually of how far along that is. Your Honor, I think for purposes of today, I hear Your Honor's question. It really wasn't disputed how far along they were. What was accepted, because again, based on the stage of the pleadings, was that there was no building, that it was at some stage of the planning process, but it was still in the planning process, right? We're on the same course. I'm with you now. Obviously, there's no building there. I don't think that's a dispute, is it? I don't think so. And there seems to be some planning, but depending on how you interpret this contract, that planning would be irrelevant, in your view. Right. Okay. That's right. And I would just say, with respect to the point that the Sky Bridge had to be known with precision before a building could be constructed, I would simply point out that the Four Seasons Hotel is constructed, right? And the concept here that the bridge comes before the building doesn't really hold water, because again, there is a building on our side to which a Sky Bridge could be connected, and it does happen, right? Well, exactly where it's—it seems to me there were some negotiations, were there not, before the deadline about where the Sky Bridge would connect to the Four Seasons. So, there are different locations, which therefore would change where it would connect across the street. So, at least there's that—whatever those options were, two or three different possible locations that had not been finalized and never would be under—maybe—would affect how the building would be constructed. There would be some variability in it. My only point was that these can be done after the fact, after the building is constructed, and the fact that the Four Seasons is standing today is a little bit testament to that. That's all. It's that simple point. But it is, with respect to the right to connect, that is how the parties in 2000 characterized this right. It was simply a right to connect, and based on the plain wording and language in the agreement, that was to actually connect, and there is no dispute that's not where we were as of December 31, 2020, and that deadline was made—time was of the essence. It was essential to the agreement. But you agree, though, that you have to—you can't do it in one day, and so once you exercise the option, you have to do some discussions and planning, and it's complicated. Well, Your Honor, I think you hit on a couple of different points. One, when you exercise the option, we completely disagree that this is an option, okay, based on the language and the structure of the agreement. In fact, the only time that the word option is even used is in Recital C, which, of course, it's just the recital. The language itself talks about rights being conveyed. The language in Section 2 specifically says and defines it as the connection right. There is no option-conveying language in the substance of the agreement. Furthermore, there's no structure that you would normally see in an option contract where you have a completed deal that will stay open until the optionee accepts. That's totally missing here. If, assuming arguendo, it is an option contract, then would there be a fact issue here and we would need to send it back? No, Your Honor, there would not be because, again, the right that is conveyed is simply a connection right. It is a right to connect, and, you know, wherever—at the end of the day, Skanska had no building. Ground hadn't even been broken, and that was Judge Eskridge's point. We're not close. Well, how close do you have—what is a reasonable amount of time in that circumstance? Again, Your Honor, we would disagree that a reasonable amount of time would be appropriate. I understand. Assume—this is all my hypothetical—that you assume that this were an options contract and that there is a reasonable time for performance afterwards. Yes, Your Honor. Assuming all that baked into the question, what is the answer to that? Your Honor, at the end of the day, what a reasonable amount of time would be would be something that is simply not present in this case because of the complete and total absence of a building on the other side. Should we affirm not for the reasons that were given by the District Court but because this wasn't—it was just an agreement to an agree, and really that's the cleanest way to deal with this? As a Texas practitioner, I completely agree. That is what I have thought from the beginning, and I think it goes to answer your question, Your Honor, because some of these details that we're grappling with here today would have been in what I would call the second span agreement. The span agreement itself contemplates and specifically requires the negotiation of a future contract that would deal with items, big picture items, like the construction of the bridge, the use, the maintenance. Now, all of this was after the parties had actually agreed on a connection right, which was a condition, right? The connection right itself has two specific conditions, one of which is that the parties will mutually agree to a connection point, and the second being that my client, the Four Seasons Hotel, had a right to push back if at the end of the day there was, in its reasonable discretion, the connection would interfere with the hotel. So I think the fact that there are these conditions in and of itself underscores that it's not an option, but it also— Let me ask you, do you have your point in your brief? I'm trying to ask this question, and I want to step on my colleague, but let me get this in here. You've already disclaimed what seems to me to be the fundamental basis for Judge Estrich's analysis, which is that the span agreement is an option and it's a unilateral contract. He says those two are, I don't know what word, significant, some word like that, important. And he goes through Texas law on unilateral contracts and options, and because there's not mutual performance involved, that's why you need reasonable time, completion, or performance. So it seems to me, and we could disagree with both of you and say that Judge Estrich is correct, but to sustain it on the basis that he did, which is that completion must be done with a reasonable period of time, it seems to me that you have cut the legs out from under that, because it's not, in your view, an option contract. Well, thank you for giving me the opportunity then to clarify, because I'm not trying to cut the legs out from underneath the— Well, I'm not. Let me take that back. I retract that. But nonetheless, you are disagreeing with the analysis, in his opinion, insofar as it being an option contract, and maybe not that it's a unilateral. But it does seem to me, in quoting the treatises that he did in 1939, Texas, whatever commission of appeals means, whatever, those cases are relying, apparently, on this understanding that it's an option contract. Your Honor, I think he assumes arguendo that it's an option contract, and he assumes that it's— But that's where you got to the reasonable time, though, because of that assumption. But I think he assumes those to get to the contract interpretation of what right is at issue. And then I think he further assumes that the reasonable time frame, you know, if you assume it's an option, if you assume it's enforceable, i.e., that it's not an agreement to agree, and you look at the right and define it as a connection, and then even if you assume that they would get a reasonable time, they still fail, because at the end of the day, they absolutely haven't started. But I guess I'm saying if you're right and it's not an option contract at all, then you just need different analysis. You can't just keep assuming the wrong legal standard. I think it's multiple reasons to affirm, His Honor, Judge Eskridge's opinion. I think this Court, this panel, can look at the definition and what was the actual right that got to be exercised as of December 31st, and Judge Eskridge, I think, got it right, all four points. Or this panel could say, well, wait a minute, we need not do that because this is no option contract. Let me add, not being enforceable at all, agreement to agree, that kind of stuff. Excuse me, it's a sliding scale. How much has to be determined, and it's very fact-specific on the nature of the agreement. And he looked at this contract and didn't make a decision. Maybe he did decide it was going to be, that would be the harder issue. What do you see, I mean, you say a lot still needed to be decided before this could be enforced, and there's a fair amount of right on the four seasons to decline what's being offered by whoever holds the span right. What is the, can you focus on what you think would have been necessary in this to make it an enforceable contract? What do you say is the fundamental absence here? Because I do think, we're looking at a collection of things, and it's going to be a close question of how much has to be there. And I want you to focus me on what do you think the fundamental absence here is? Your Honor, I have practice in this area. I understand what Your Honor means by the sliding scale of where is enough versus not. But in this instance, we are literally talking about the construction, the use, the maintenance of a sky bridge that is going to span a busy street in downtown Houston. And there are frankly very little details that are provided as of 2000. It was all, it would be done in the future. So from our perspective, there are many, many details that would have to be and should have been negotiated in 2000 to take this out of the agreement to agree. For example, the exact location of the connection. When would construction begin? When would construction end? What does it look like? 20 years ago, was this a separate, was there a separate consideration for this span agreement? Can that be determined? Your Honor, not. It's one thing to say, we know we're just agreeing to agree, but we're thinking about it, let's put this in the agreement. And then it's recorded or some aspect of it's recorded. So it's some sort of burden on the property, I suppose. But is anything suggesting here that there was no separate consideration for this and the parties understood it just to be an agreement to agree? Your Honor, that's an excellent point. Thank you. So the broader prospect of the deal, and I think this is actually contained in the span agreement itself, in the actual recitals, you have these two blocks, Block 252, which is Mount Jefferson, the Four Seasons Hotels, and Block 251, which was just flat concrete. At the time, Crescent owned them both. And Crescent sold the Four Seasons to HEF. There was a Four Seasons Hotel at the time. Yes, sir, Your Honor. And in fact, it's specifically recited in the recitals, right? That Crescent was selling to HEF the Four Seasons. Crescent was retaining Block 251 and this span agreement. We then fast forward 19 years when Skanska bought it in 2019. And then the right itself expired as of its own express terms as of December 31, 2020. So those are the details that are before the court with respect to the span agreement and with respect to this right to connect. So even in the year 2000, you had the Four Seasons Hotel in a flat concrete parking lot, right? And the question then became, was this an option that was granted or was it just some right in the future that, who knows, right? It was not an option contract. Again, just based on the plain language of the agreement itself based on the structure. And instead, what they did is they left open to negotiate all of those details. Can you tell us, what part of Discovery Green was, I can't, it's, in the record, do we know, what else was there at that time? Or is that not in the record? You can't. I'm sorry, I don't quite follow the question or at least I want to clarify it. I'm trying to ask, I can't remember when we got Discovery Green and all of that. I don't remember because it's all related to that and I don't remember when that was. But that may not be in the record, so it's okay if you don't answer that. Well, thank you. I'm not sure that it is in the record and I don't know the date off the top of my head. I have, you know, 15 to 20 years ago, but I would, you know, I'm cautious about stating that as a representation to the court. But this was one of those parking lots? Yes, Your Honor. At the time. This was in, well, again, it depends on when we're talking about at the time. If we're talking about when SCD- It was consummated when it was- In 2000. I believe so, but I'm not positive. What we do know is that when Skanska acquired and when the motion was being heard, there was no building there. What was the consideration for this? For this- In 2000? If assuming arguendo it's an option, what was the consideration given for it? In 2000? Mm-hmm. I think at the end of the day, that would have all been factored into, and again, assuming arguendo, that all would have been factored into the 2000 sale of the Four Seasons Hotel and the parties themselves would have put whatever price they would have put on this right to connect at that point in time. We do not have discovery. No one has, again, we're at the 12C stage and no one has gone into the discovery of trying to identify the specific details of the contract beyond what's in the recitals and what was before Judge Eskridge when he had the motion and he interpreted the right to connect. Your Honors, I see where I'm about out of time. I have managed to make it through the points that I wanted to make, and unless there's... What case would you want us to read if we were to read on agreement to agree? D.K. Holmes and I can... I believe it's D.K. Holmes versus Vizant, but it is cited, excuse me, D.K. Holmes versus Kilgo is on point and it is cited in our brief, pages 46, 47, and 48. At the end of the day, it is a residential real estate contract, so it's in a different context, but there was an agreement to purchase a piece of land with a promise to build in the future and to use the seller of the land as the constructor of the house, and when the homeowners decided to go elsewhere, the constructor, D.K. Holmes, sued claiming breach of contract to which the court ultimately found that it was just an unenforceable agreement to agree because there were so many aspects, including what was going to be the size and the location of the house that were left to future negotiations that it was impossible for the court to enforce, quote, that original contract, that contract to build. As such, it was an unenforceable agreement to agree. Okay. Your Honors, thank you for your time. Thank you. We haven't decided to do anything. Yes, Your Honor. Just to answer that recent question about which case, D.K. H. Holmes, as the court knows, is an unpublished Texas Court of Appeals opinion, which is persuasive, but the Fisher case, which is a Texas Supreme Court case that came later, is on point. Also, the contract in D.K. H. Holmes is just so different from this one. I think it's not a really good comparison. It was just the idea to start building a home. There weren't any of the kind of terms that we have here that are cabined. One term here that's been disputed as too open is the exact location of the connection point. Well, it's already cabined in the agreement by knowing that it has to be on the third floor or below, and it cannot interfere with existing configuration of the hotel. That's nothing like the agreement in D.K. H. Holmes. Just to go back to a few other questions, there's an issue about discovery, and what do we know has been exchanged. The parties conducted very little discovery because we were all trying to resolve this efficiently, but some of the things that were disclosed that are not in the record are the existing span agreements that the Four Seasons or Mount Jefferson has for the two other existing sky bridges. And I don't know if it's fair to get into what's in those, but they're just a lot more detailed than the span agreements. So with those as a reasonable standard, which Fisher talks about, is there something that you can reference as a reasonable standard? Those are the reasonable standard by which we could plug in. There's a suggestion here from my friend on the other side that in 2000, the parties needed to agree to all of these details, like the design, the exact location. If we take Mount Jefferson at that point, we kind of forget about the realities of commercial real estate, that design changes, that codes change, that insurance coverage that you negotiated for in 2000, the insurance company could be out of business. There's so much there that just, you know, commercial parties are entitled to negotiate and, you know, bind themselves to an agreement. And here they did, understanding the realities of complex commercial transactions. It struck me the agreement may well be enforceable, I don't know, but it did strike me as having an awful lot of loose ends to it. Is there any fact question involved or is it strictly a legal issue of whether it's a contract or an agreement to agree? Enforceable contract. I think it's a legal question, Your Honor. I think it is too, but I want to know if you had any other view. No, I didn't. Thank you, Your Honor. I also want to bring up, it sounds like consideration was a question that the court had. Consideration was exchanged. There was consideration for this agreement. It's, and it's not just in the recitals in the SPAN agreement, it's in the substantive part that mentions that consideration was exchanged here. And that's really important. It wasn't disputed before. Are you saying a separate payment, a separate part of the sales price was for this SPAN agreement? That is how we read it. Recital in some contract that's in the record. Yes, Your Honor. Well, there's a, in the SPAN agreement that I'll cite to ROA 17. It, there is a recital that talks about the sale when our predecessor sold the property for the hotel to Mount Jefferson. And then we, in return, got the option to build the Skybridge. This is really important in terms of Texas contract law and property rights. If, if there is, if this agreement is just an agreement to agree, if that's how it's interpreted, then we lose a bargain for property right. Texas law, the Texas Supreme Court says we should try to enforce contracts, not void them or not enforce them. We shouldn't, sorry, Your Honor. Okay. Oh, okay. And, and we would lose a valuable property right that we negotiated and paid for if it wasn't enforced. There's no specific method or standard to determine because those, those agreements, those other executed things that you referenced are not incorporated into this agreement. So there's nothing to determine what the specifications or ways to even decide where the bridge should be in this contract. And isn't that fatal under Fisher? Your Honor. That you want to rely on? Your Honor, I disagree. I think that by referencing the existing span agreements, which the, the span agreement does, that they should be in the form of those agreements. I think that that's sufficient. And yes. How would they decide where to put this? So that would be an issue that they need to work out when we propose they need to either decline or, you know, yes, they could decline if, but, but there's a reasonable standard it says they can only withhold consent, you know, for certain, to certain reasons. And those are enforceable. There's not a detail to be worked out where the bridge is going to be, it seems though. It's hard. It's a hard argument. Yes, Your Honor. But, but we think it's sufficiently definite under Fisher and to, to hold otherwise would void our, you know, bargain for contract right. Okay. Thank you so much. Thank you so much. We have your arguments. This case is submitted. We appreciate the arguments of, of both counsel over there. Very helpful to the court. Thank you. Thank you. The court will stand in recess until tomorrow morning at 9 a.m. All rise.